Electronically Filed
3/29/2022 4:31 PM
Steven D. Grierson
CLERK OF THE COURT

**COMP**
WRIGHT, FINLAY & ZAK, LLP
Darren T. Brenner, Esq.
Nevada Bar No. 8386
Lindsay D. Dragon, Esq.
Nevada Bar No. 13474
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
(702) 637-2345; Fax: (702) 946-1345
dbrenner@wrightlegal.net
ldragon@wrightlegal.net
*Attorneys for Plaintiff, Deutsche Bank National Trust Company as Trustee for Morgan Stanley ABS Capital I Inc. Trust 2006-NC5, Mortgage Pass-Through Certificates, Series 2006-NC5*

CASE NO: A-22-850446-C
Department 1

**EIGHTH JUDICIAL DISTRICT COURT**
**CLARK COUNTY, NEVADA**

| | |
|---|---|
| DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE FOR MORGAN STANLEY ABS CAPITAL I INC. TRUST 2006-NC5, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-NC5<br><br>                    Plaintiff,<br><br>        vs.<br><br>NORTH AMERICAN TITLE INSURANCE COMPANY, INC.; and ROE CORPORATIONS XI through XX, inclusive,<br><br>                    Defendants. | Case No.:<br>Dept. No.:<br><br>**COMPLAINT**<br><br>**ARBITRATION EXEMPT: ACTION FOR DECLARATORY RELIEF** |

        Plaintiff, Deutsche Bank National Trust Company as Trustee for Morgan Stanley ABS Capital I Inc. Trust 2006-NC5, Mortgage Pass-Through Certificates, Series 2006-NC5 ("Deutsche Bank"), by and through its attorneys of record, Darren T. Brenner, Esq. and Lindsay D. Dragon, Esq., of the law firm of Wright, Finlay & Zak, LLP, hereby submits its Complaint against Defendant, North American Title Insurance Company ("North American") for breach of its obligation to defend and indemnify Deutsche Bank under a lender's title insurance policy that North American issued to insure a deed of trust on real property located in Nevada.

Title insurers, like North American, have known since the early 1990s that homeowners associations in some states, including Nevada, impose liens that can attain super-priority over senior mortgages and deeds of trust. Title insurers are the experts on title and lenders rely upon and pay them handsomely for their expertise and protection.

Title insurers, like North American, have acknowledged the coverage that Deutsche Bank claims is due and owing in their manuals. These insurers themselves developed the trade usage describing the endorsements at issue in this case as providing coverage to an insured lender for losses caused by the enforcement of a homeowners association's super-priority lien.

North American's coverage position in this specific case is directly at odds with the trade usage title insurers developed globally. This factual background must be considered when interpreting the title insurance contract drafted and issued by North American to Deutsche Bank's predecessor-in-interest.

## **PARTIES**

1.    Plaintiff Deutsche Bank is a national banking association as that term is defined in the National Bank Act.  Deutsche Bank has its main office in California and doing business in Clark County, Nevada.

2.    On information and belief, North American is a California corporation with its principal place of business in Miami, Florida and doing business in Clark County, California as an underwriter of title insurance policies.

3.    On information and belief, North American wrote, implemented, and issued title insurance policies, including the title insurance policy at issue in this litigation.

4.    Deutsche Bank does not know the true names, capacities or bases of liability of fictitious defendants sued as Does I through X and Roe Corporations XI through XX, inclusive (collectively "Fictitious Defendants").  Each Fictitious Defendant is in some way liable to Deutsche Bank.  Deutsche Bank will amend this Complaint to reflect the true names of said Fictitious Defendants when the same have been ascertained.

5.    This matter is exempt from Arbitration as Deutsche Bank has requested a declaration that the title insurance policy issued by North American provided coverage for all

losses or damages, up to the Amount of Insurance, sustained by Deutsche Bank as a result of the HOA's foreclosure sale.

6.      This Court has personal jurisdiction over North American because it has engaged in the business of issuing title insurance policies insuring deeds of trust on land located in the State of Nevada, tortiously denied thousands of claims for coverage under policies affecting insured interests on real property located in Nevada.  North American therefore has sufficient contacts with the State to have availed itself of the State's jurisdiction.

7.      Venue is appropriate in this Court because this judicial district is where a substantial part of the events giving rise to Deutsche Bank's claims took place, and it is the location of the property subject to the insured deed of trust that is at the core of this lawsuit.

## FACTUAL BACKGROUND

### *Nature of Title Insurance*

8.      A title insurance policy is a contract through which the insurer is paid one sum in consideration for agreeing to defend an insured's security interest in a property, and to indemnify the insured against loss caused by encumbrances upon or defects in the title of real property in which the insured has an interest.

9.      Lenders often seek to obtain title insurance policies in connection with loans they advance that are secured by interests in real property. The title insurance policy generally protects the lender against risks associated with loss of title or practical use of the property, subject to the policy's terms, exclusions, and conditions.

10.      This lawsuit concerns the issuance of a title insurance policy in favor of "New Century Mortgage Corporation and/or assigns"[1]

11.      Deutsche Bank is the insured entity under the title insurance policy as the successor and/or assignee of New Century Mortgage Corporation.

12.      Before 2014, North American, and other title insurers like them, issued a number of title insurance policies.

---

[1] A true and correct copy of the Policy is attached hereto as **Exhibit 1**. *See id.* at p. 1, Schedule A.

13.    The large majority of title insurance policies issued by North American and their issuing agents use standard forms promulgated by the American Land Title Association ("ALTA") and the California Land Title Association ("CLTA").

14.    ALTA and CLTA are trade groups made up of representatives from the major title insurance underwriters and issuers, including North American.

15.    Other major title insurers that issued similar standard form title policies with the same or similar ALTA and CLTA form endorsements include: Fidelity National Title Insurance Company ("Fidelity"); Chicago Title Insurance Company ("Chicago Title"); Commonwealth Land Title Insurance Company, Old Republic National Title Insurance Company, Stewart Title Guaranty Company ("Stewart Title") and Westcor Land Title Insurance Company.

16.    These standard form policies and endorsements are used by multiple title insurers, which publish guides concerning the scope of coverage (and exceptions thereto) provided under the standard form policies and endorsements. The standard ALTA policy form has been revised from time to time, including changes in 1992, 2006, and 2012.

17.    There are a number of ALTA standard endorsements that can be issued with the standard policy to modify the scope of coverage available.

18.    Chicago Title issued a 2013 Endorsement Manual which states that "endorsements will provide additional coverage for matters which would ordinarily be excluded by the Exclusions From Coverage, or excepted from coverage shown in Schedule B of" a title insurance policy.[2]

19.    Fidelity's Endorsement Guide similarly states that endorsements will expand coverage which would other be excluded under the policy exclusions and exceptions.[3]

20.    This is consistent with trade usage of the term "endorsement" among title insurers and their insureds. *See, e.g.*, Joyce D. Palomar, *Title Insurance Law* § 9:1 (2013-14 ed.) (explaining that endorsements serve two primary purposes: (1) "they may provide affirmative coverage for facts that exist in a transaction which standard title insurance policies have not

---

[2] A true and correct copy of the Chicago Title's 2013 Endorsement Manual is attached as **Exhibit 2**.

[3] A true and correct copy of Fidelity's Endorsement Guide is attached as **Exhibit 3**.

traditionally addressed," or (2) they "may 'insure over' or modify the effect of preprinted policy exclusions or exceptions").

21.    Lenders commonly request that title insurers issue ALTA Endorsement Form 9 ("ALTA 9").

22.    The ALTA 9 is the equivalent of the CLTA Endorsement Form 100 ("CLTA 100").

23.    The ALTA 9/CLTA 100 is a "comprehensive" endorsement that provides a range of guarantees to the insured relating to the existence of covenants, conditions, or restrictions affecting or governing the property which could cause damage to the insured lender's interest at the time the policy is issued or in the future.

24.    It is also commonly understood between title insurers and their insureds that ALTA 9/CLTA 100 "[p]rovides comprehensive coverage for [an] insured ALTA lender against loss by reason of present *or future* [covenants, conditions and restrictions] violations[.]"[4]

25.    Fidelity also issued an Endorsement Manual which explained that the ALTA 9/CLTA 100 "expand[s] policy coverage by minimizing the risk to the Insured with respect to certain policy exclusion or exceptions."[5]

26.    James L. Gosdin is the immediate past chair of the ALTA forms committee that drafted, approved, and/or issued the ALTA 9. Mr. Gosdin is also the Senior Vice-President, Senior Underwriting Counsel, and Chief Reinsurance Counsel for Stewart Title. As Mr. Gosdin has explained, the ALTA 9-06 "insures priority of the lien of the Insured Mortgage over future assessments by property owner's associations". James L. Gosdin, *Title Insurance: A Comprehensive Overview* 26 (3d ed. 2007).[6]

---

[4] *Id.* at 1 (emphasis added).
[5] A true and correct copy of Fidelity's Endorsement Manual is attached as **Exhibit 4** at p. 63. While the Endorsement manual concerns the 2006 version of ALTA 9, the ALTA 9-06, the Manual states that Form 9-06 "most closely resemble[s] the coverages given under the old loan policy endorsement forms." Additionally, the language in both versions of the endorsement are substantially the same and, on information and belief, North American considers the coverage afforded by both ALTA 9 and ALTA 9-06 to be the same.
[6] A true and correct copy of Mr. Gosdin's similar 2006 writing entitled "the 2006 ALTA Forms" is also attached hereto as **Exhibit 5**.

27.     The ALTA 9 is materially indistinguishable from ALTA 9-06 as far as the coverage provided for Nevada HOA super-priority liens.

28.     North American is aware that the ALTA 9 is materially indistinguishable from the ALTA 9-06 as far as the coverage provided for Nevada HOA super-priority liens.

29.     On information and belief, North American's policies, practices, and procedures acknowledge the ALTA 9 is materially indistinguishable from the ALTA 9-06 as far as the coverage provided for Nevada HOA super-priority liens.

30.     Lenders often also request that title insurers issue ALTA Endorsement Form 5 ("ALTA 5"). ALTA 5-06 "provide affirmative insurance for lenders loaning on the security of units in a Planned Unit Development" against "loss from lack of priority of the mortgage lien over the lien for homeowners' association assessments.[7]

31.     The ALTA 5 is materially indistinguishable from the ALTA 5-06 as far as the coverage provided for Nevada HOA super-priority liens.

32.     The ALTA 5 is the equivalent of the CLTA Form 115.2.

33.     North American is aware that the ALTA 5 is materially indistinguishable from the ALTA 5-06 as far as the coverage provided for Nevada HOA super-priority liens.

34.     On information and belief, North American's policies, practices, and procedures acknowledge the ALTA 5 is materially indistinguishable from the ALTA 5-06 as far as the coverage provided for Nevada HOA super-priority liens.

35.     Mr. Gosdin has written that ALTA 5-06 also insures "priority of the lien of the Insured Mortgage over future assessments by property owner's associations."[8] Mr. Gosdin has also opined that the ALTA 5 and ALTA 5-06 "insures the priority of mortgage over future assessments" in super-priority states including Nevada.  James L. Gosdin, *Title Insurance: A Comprehensive Overview* 678-79 (3d ed. 2007).

---

[7] Ex. 2 (Chicago Title's 2013 Endorsement Manual).
[8] *See also* Ex. 5 (Gosdin 2006 ALTA Forms) at p. 17. In Mr. Gosdin's article, he analyzed ALTA Form 5-06, which, as relevant here, was substantively identical to ALTA 5. *cf.* James L. Gosdin, *Title Insurance: A Comprehensive Overview* 678-79 (3d ed. 2007) (noting that in States that give associations super-priority liens, the issuing title agent may use an alternative to ALTA Form 5 or modify the endorsement).

36.     Mr. Gosdin and other industry trade usage experts have opined that the ALTA 5 is materially indistinguishable from the ALTA 5-06 as far as the coverage provided for Nevada HOA super-priority liens. *Id.*

**North American Issued Policies Understood to Cover Nevada Super-Priority Liens**

37.     In 1982, the Uniform Law Commission promulgated the Uniform Common Interest Ownership Act ("UCIOA"). UCIOA provided a number of standardized terms governing the formation of common interest community associations, including condominium associations and homeowners associations.

38.     As relevant here, UCIOA provided that homeowners associations' covenants, conditions, and restrictions included a "super-priority" lien for unpaid assessments, which came into existence when the association was formed (i.e., when its declaration of covenants, conditions, and restrictions were recorded), and would take priority over a subsequently recorded mortgage or deed of trust even if no assessments were due at the time the mortgage or deed of trust was recorded.

39.     In 1991, the Nevada Legislature adopted the 1982 version of UCIOA, codifying it in Chapter 116 of the Nevada Revised Statutes.

40.     NRS Chapter 116 includes NRS 116.3116, which, at the time of the events relevant to this suit, stated in relevant part:

> 1.   The association has a lien on a unit for any construction penalty that is imposed against the unit's owner pursuant to NRS 116.310305, any assessment levied against that unit or any fines imposed against the unit's owner from the time the construction penalty, assessment or fine becomes due. . . .
>
> 2.   A lien under this section is prior to all other liens and encumbrances on a unit except:
> . . .
> (b) A first security interest on the unit recorded before the date on which the assessment sought to be enforced became delinquent . . . ;
> . . .
> The lien is also prior to all security interests described in paragraph (b) to the extent of any charges incurred by the association on a unit pursuant to NRS 116.310312 and to the extent of the assessments for common expenses based on the periodic budget adopted by the association pursuant to NRS 116.3115 which would have

become due in the absence of acceleration during the 9 months immediately preceding institution of an action to enforce the lien . . . .

. . .

4. Recording of the declaration constitutes record notice and perfection of the lien. No further recordation of any claim of lien for assessment under this section is required.

41.    Under NRS 116.3116, from the time an association's covenants, conditions, and restrictions are recorded, the properties governed by the association are encumbered by a lien that secures all assessments. NRS Chapter 116 does not require that an association record a separate lien before the lien is foreclosed.

42.    As part of its adoption of UCIOA, the Nevada Legislature also enacted NRS 116.1104:

Except as expressly provided in this chapter, [NRS 116's] provisions may not be varied by agreement, and rights conferred by it may not be waived. Except as otherwise provided in paragraph (b) of subsection 2 of NRS 116.12075, a declarant may not act under a power of attorney, or use any other device, to evade the limitations or prohibitions of this chapter or the declaration.

43.    The Nevada Legislature also enacted NRS 116.1206(1):

Any provision contained in a declaration, bylaw or other governing document of a common-interest community that violates the provisions of this chapter shall be deemed to conform with those provisions by operation of law, and any such declaration, bylaw or other governing document is not required to be amended to conform to those provisions.

44.    North American and other title insurers were aware of Nevada's adoption of NRS 116, including its provision of a "super-priority" lien in a homeowners association's covenants, conditions, and restrictions.

45.    North American and other title insurers knew they could be liable for an insured's losses caused by the enforcement of an association's super-priority lien if the policy at issue contained an ALTA 9/CLTA 100 and/or ALTA 5/CLTA 115.2 like the ones under the subject Policy.

46.    In a bulletin dated December 12, 1991, Stewart Title sent its issuing agents in eleven States (including Nevada), a bulletin indicating that ALTA 9 and ALTA 5 would provide

coverage for losses caused by associations' super-priority liens.[9] Stewart Title provided specific instructions to its agents to delete paragraph 2 of ALTA 5 and paragraph 2 of ALTA 9 before including either endorsement with a title insurance policy.[10]

47.    In July 1993, Stewart Title issued another bulletin to its issuing agents in twelve States (including Nevada) indicating that "future assessments (usually six months) have priority over a prior mortgage," and that issuing agents should issue ALTA 5.1 or modified condominium endorsement instead of ALTA 5.[11] Further, if issuing ALTA 9 with their policies, issuing agents should add the following exception to ALTA 9: "[t]he Policy and any endorsements to the Policy do not insure against loss because of condominium assessments not yet due and payable."[12]

48.    On information and belief, between 1991 and 2014, North American also provided instructions to its issuing agents to not issue or modify ALTA 9/CLTA 100 and ALTA 5/CLTA 115.2 with any policies in Nevada for a property governed by a homeowners association in recognition of the coverage provided under these forms.

49.    In 2007, LandAmerica Financial Group, Inc., a company whose assets are now owned by Fidelity, issued to its subsidiaries an Underwriting Manual which quotes Paragraph 1(a) of ALTA 9 and provides the following underwriting guidelines for issuing a policy with ALTA 9:[13]

1.    Any incorrectness in the assurance that, at Date of Policy:

    a)    There are no covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.

To give this coverage, the underwriter must review all covenants, conditions and restriction listed in the title report to determine if there is language which could result in forfeiture, reversion or other impairment. Note that other impairment is added to traditional forfeiture or reversion. This includes a provision permitting a home owners or civic association to levy an assessment, secured by a lien with priority over the insured deed of trust. Under the Property Owners Association Act, 55-508, et seq., some owners associations can levy for limited purposes, with limited super-priority.

---

[9] A true and correct copy of Stewart Title's 1991 Bulletin is attached as **Exhibit 6**.
[10] *Id.*
[11] A true and correct copy of Stewart Title's 1993 Bulletin is attached as **Exhibit 7**.
[12] *Id.*
[13] A true and correct copy of LandAmerica's Underwriting Manual is attached as **Exhibit 8**.

50.     On information and belief, North American has published and/or followed similar underwriting manuals and instructions indicating that Paragraph 1(a) of ALTA 9 provides coverage for losses due to "provision[s] in recorded covenants, conditions and restrictions] permitting a home owners or civic association to levy an assessment, secured by a lien with priority over the insured deed of trust."

51.     From 1991 until the present and on information and belief, North American has provided endorsement manuals for its issuing agents explaining the scope of coverage provided by ALTA 9/CLTA 100 and ALTA 5/CLTA 115.2.

52.     On information and belief, North American's endorsement manuals informed its issuing agents that ALTA 9/CLTA 100 and ALTA 5/CLTA 115.2 would provide coverage to an insured that suffered loss or damage due to an association's lien for assessments that became delinquent after the date of policy.

53.     Even after the amendments to ALTA 9/CLTA 100 and ALTA 5/CLTA 115.2; however, title insurers have promulgated endorsement manuals indicating that the operative language in earlier versions of the forms would provide coverage to an insured for losses or damages suffered as a result of the enforcement of an association's super-priority lien.

54.     In Fidelity's 2013 Endorsement Manual provided for the use of all of its subsidiary underwriters and their agents, Fidelity explained that ALTA 5-06 should not be used unless CC&Rs or state law provide the insured mortgage priority to lien for unpaid assessments.[14] Further, certain language from ALTA 9-06 should not be used in policies where "a FUTURE violation might result in the loss of priority or enforceability of the lien of the Insured Mortgage," indicating title insurers' belief that the language created coverage for the insured.[15]

55.     Contemporary trade usage describing the terms and scope of ALTA 9 indicates that such endorsements provide coverage for an insured lender in the event that covenants, conditions, and restrictions of record at the date of the policy allow an association's lien to take priority over the insured mortgage or deed of trust. *See, e.g.*, Barlow Burke, *Law of Title Insurance*

---

[14] Ex. 3 (Fidelity's Endorsement Manual) at 34.
[15] *Id.* at 65.

§ 10.05[B] (3d ed., 2002 Supp.) (in describing ALTA 9: "A second type of endorsement of interest to an insured lender is one covering the loss of lien priority because of the enforcement of a private covenant applicable to the title. … The priority of these covenants, restrictions, and conditions is particularly important to mortgage lenders with loan policies because their supporting documents, also recorded, typically include the power to compel the payment of amounts for the maintenance and repair of the common facilities in a large subdivision.  Often the exercise of these maintenance and repair functions is put in the hands of a subdivision homeowner's association.  It also typically holds a lien to compel the payment of these amounts, and that lien also has priority over later recorded mortgage."); *id.* ("Future violations [of covenants, conditions, and restrictions] are also insured against, but only to the extent that the violations occur between the policy date and the acquisition of title in any foreclosure action, provided the violation causes the insured to be insecure or results in loss or damage to the title acquired by the insured in satisfaction of the secured debt, as where the insured takes a deed in lieu of foreclosure."  (citing ALTA 9 ¶¶ 1(a), 2)); *see also* James L. Gosdin, *Title Insurance: A Comprehensive Overview* (3d ed. 2007).

56.    Custom and evidence of trade usage are relevant when construing policy terms. *Galardi v. Naples Polaris, LLC*, 129 Nev. 306, 311-312, 301 P.3d 364, 367 (Nev. 2013).

57.    The United States Court of Appeals for the Ninth Circuit recently confirmed that "claims manuals are clearly relevant" and "Nevada law permits courts to consider the custom and practices of the trade even when construing a contract that is unambiguous in its terms." *Wells Fargo Bank, N.A. v. Fid. Nat'l Title Ins. Co*., No. 19-17332, 2021 U.S. App. LEXIS 32975, at *4-5 (9th Cir. Nov. 5, 2021) (citing *Galardi*, 129 Nev. at 311-312); *see also Deutsche Bank Nat'l Tr. Co. v. Fid. Nat'l Title Ins. Co*., No. 20-15849, 2021 U.S. App. LEXIS 32311 (9th Cir. Oct. 28, 2021); *HSBC Bank USA, N.A. v. Fidelity National Title Insurance Company¸* No, 20-15387, 2021 U.S. App. LEXIS 36263 (9th Cir. Dec. 9, 2021).

58.    North American represented to the public and to Deutsche Bank's predecessor-in-interest that ALTA 9/CLTA 100 and ALTA 5/CLTA 115.2 provided coverage against losses caused by an association's super-priority lien.

59.     Despite having actual knowledge of the possibility that Deutsche Bank could lose its security interest in properties that were governed by homeowners associations, at no time did North American inform Deutsche Bank or its predecessors-in-interest of the danger of losing its security interests in such properties.

60.     Indeed, North American found Deutsch Bank's claim to be potentially covered and yet failed to defend Deutsch Bank in the HOA litigation or conduct an adequate investigation into Deutsche Bank's title claim.

61.     North American implemented patterns and practices which call for the denial of claims stemming from Nevada HOA foreclosure sales, despite North American's actual knowledge that the claims fell under the insuring provisions and policy endorsements.

### The Nevada Supreme Court Interprets NRS 116.3116

62.     In *SFR Investments Pool 1, LLC v. U.S. Bank, N.A.*, 130 Nev. 742, 334 P.3d 408 (Nev. 2014), the Nevada Supreme Court confirmed that a portion of the lien included in a Nevada homeowners association's covenants, conditions, and restrictions has super-priority over a recorded first deed of trust.

63.     The Court further held that NRS 116.1104 rendered inoperative clauses in associations' covenants, conditions, and restrictions that purported to allow senior deeds of trust to survive an association's foreclosure of the super-priority lien provided in its covenants, conditions, and restrictions.

64.     *SFR Investments* confirmed that the proper foreclosure of an association's super-priority lien extinguishes a recorded senior deed of trust on the same property.

65.     Following *SFR Investments*, Stewart Title issued a bulletin to its agents in Nevada indicating that "in lieu of issuing an ALTA 9 for a lender's policy," its agents should "issue the ALTA 9.10."[16] Additionally, the underwriters were also instructed that "in lieu of issuing an ALTA 5 for a lender's policy" to issue the ALTA 5.1 instead."[17]

---

[16] A true and correct copy of Stewart Title's Bulletin NV2014002 is attached as **Exhibit 9**.
[17] *Id*.

66. Other major title insurers have issued similar bulletins as a result of the decision in *SFR Investments*.

67. On information and belief, North American sent similar bulletins to its agents following *SFR Investments*, indicating its belief that ALTA 9/CLTA 100 and ALTA 5/CLTA 115.2 provided coverage for losses caused by super-priority liens.

68. In *K&P Homes v. Christiana Trust*, 133 Nev. 364, 398 P.3d 292 (Nev. 2017), the Nevada Supreme Court held that *SFR Investments* "did not create new law or overrule existing precedent; rather, that decision declared what NRS 116.3116 has required since the statute's inception" in 1991.

69. Under controlling Nevada law, the covenants, conditions, and restrictions at issue here have provided the association with a lien that could attain priority over a senior deed of trust since 1991.

### The Underlying Property and HOA Foreclosure Sale

70. This action concerns real property located at 5916 Post Mountain Street, North Las Vegas, Nevada 89031, APN: 124-27-713-018 (the "Property").

71. The Property is subject to a Declaration of Covenants, Conditions and Restrictions ("CC&Rs") for Sierra Ranch Homeowners Association (the "HOA") recorded on August 30, 2005.[18]

72. The CC&Rs, including Article XVIII, Section 18.3 create the association's lien: "The Association has a lien on a Unit for an assessment levied against the Unit or fines imposed against its Unit Owner from the time the assessment or fine becomes due." [19]

73. Section 18.12(a) states: "All Assessments, together with interest, costs, and reasonable attorneys' fees for the collection thereof, shall be a charge on the land and shall be a continuing lien upon the Unit against which such assessment is made."[20]

---

[18] A true and correct copy of the recorded CC&Rs of the HOA is attached as **Exhibit 10**.
[19] *Id.* at 43, Section 18.3(a).
[20] *Id.* at 47, Section 18.12(a).

74. Thus, pursuant to the CC&Rs, an owner of the Property covenants to pay assessments, and those assessments constitute a charge on the land secured by a continuing lien that has encumbered the property since the CC&Rs were recorded.

75. While Article XVIII, Section 18.3(a) of the CC&Rs purports that a First Security Interest is prior to the assessment lien to the extent the assessment sought to be enforced became delinquent after that date,[21] there is a specific carve out for the super-priority lien described in Section 18.3(a).

76. Section 18.3(b) of the CC&Rs states:

"Except to the extent permitted under the Act (NRS 116.3116(2)), a lien under this Section is prior to all other liens and encumbrances on a Unit except:…(2) a first Security Interest on the Unit recorded before the date on which the assessment sought to be enforced became delinquent."[22]

77. Moreover, the CC&Rs require the HOA to foreclose "by the same procedure set forth in NRS 116.31162 and NRS 116.31164."[23]

78. Regardless of whether the CC&Rs incorporate NRS 116.3116 by reference, which in this case they do, the CC&Rs are deemed to "conform" and incorporate NRS 116.3116 by operation of law. *See* NRS 116.1206(1) ("Any provision contained in a declaration, bylaw or other governing document of a common-interest community that violates the provisions of this chapter shall be deemed to conform with those provisions by operation of law, and any such declaration, bylaw or other governing document is not required to be amended to conform to those provisions.").

79. NRS 116.3116(9) states that recording of the CC&Rs constitutes "record notice and perfection" of the association's lien. "No further recordation of any claim of lien for assessment under this section is required." *Id.*

---

[21] *Id.* at Section 18.3(a).
[22] *Id.* at Section 18.3(b).
[23] *Id.* at 44, Section 18.3(g).

80.     The CC&Rs, through Section 18.3(c) also state that "Recording of the Declaration constitutes record notice and perfection of the lien. Further recording of lien for assessment under this Section is not required."[24]

81.     The CC&Rs recorded in August 30, 2005. The Policy issued in June 8, 2006.

82.     Thus, the CC&Rs provided the association with a super-priority lien over the lien of the insured mortgage pursuant to NRS Chapter 116 as of the Date of Policy.

83.     On or about May 26, 2006, non-party borrower, Vincent Vray Tes ("Borrower") purchased the Property.[25]

84.     By purchasing the Property, Borrower covenanted to pay the assessment established and collected pursuant to the CC&Rs.[26]

85.     The Deed of Trust executed by Borrower (hereinafter "Deed of Trust") identified New Century Mortgage Corporation ("New Century" or "Lender") as the Lender and North American as the Trustee securing a loan in the amount of $273,992.00 (the "Tes Loan").[27]

86.     North American owed special fiduciary duties to Lender as the Trustee under the Deed of Trust.

87.     The Deed of Trust, along with the promissory note and all indebtedness due thereunder, was subsequently assigned to Deutsche Bank.[28]

### *Title Insurance Policy*

88.     As part of the loan origination, North American entered into a contractual relationship with Lender as the insured on a lender's title insurance policy, Policy Number 903259 (the "Policy"), dated June 8, 2006 (the "Date of Policy"), naming New Century and/or its assigns, as the insured thereunder to insure that the Deed of Trust was superior to competing liens,

---

[24] *Id.* at Section 18.3(c).

[25] A true and correct copy of the Grant, Bargain and Sale Deed recorded in the Clark County Recorder's Office as Document Number 20060608-0004101 on June 8, 2006 is attached hereto as **Exhibit 11**. All other recordings stated hereafter are recorded in the same manner.

[26] Ex. 10 (CC&Rs) at 43 (Section 18.3(a)).

[27] A true and correct copy of the Deed of Trust recorded as Document Number 20060608-0004102 on June 8, 2006 is attached hereto as **Exhibit 12.**

[28] A true and correct copy of the Corporation Assignment of Deed of Trust Nevada recorded as Document Number 201003050003361 on March 5, 2010 is attached hereto as **Exhibit 13**.

1  including the association's lien.[29]

2      89.    North American was responsible for providing coverage that insured the Deed of

3  Trust in first position over all other liens, and other representations contained in the Policy.

4      90.    Additionally, North American agreed to undertake the obligation of procuring,

5  issuing, and/or providing coverage that insured the Lender's Deed of Trust was in superior

6  position over the association's lien.

7      91.    On information and belief, Lender intended that the loan would be transferred to

8  Deutsche Bank shortly after origination and, therefore, intended that all rights, promises and

9  protections guaranteed to it during the escrow and origination process, as reflected in the escrow

10  and origination documents, including but not limited to the HUD-1 Settlement, Preliminary Title

11  Report, Lender's Closing Instructions and Title Policy, would be for the benefit of Deutsche Bank

12  and would transfer to Deutsche Bank as if Deutsche Bank had been a party to the escrow and

13  origination of the loan.

14      92.    The Policy obligates North American to pay the costs, attorneys' fees, and

15  expenses incurred in the underlying quiet title action and in the defense of Deutsche Bank's lien

16  in the Deed of Trust, as insured.[30]

17      93.    "An insurer's duty to defend is triggered whenever the potential for

18  indemnification arises, and it continues until this potential for indemnification ceases." *Nautilus*

19  *Ins. Co. v. Access Med., LLC*, 482 P.3d 683, 687 (Nev. 2021) (quoting *Benchmark Ins. Co. v.*

20  *Sparks*, 127 Nev. 407, 412, 254 P.3d 617, 621 (2011)).

21      94.    There is a potential for coverage when the allegations in the third party's complaint

22  show that there is "arguable or possible coverage," or when the insurer "ascertains facts which

23  give rise to the potential of liability under the policy[.]" *Id.* (quoting *Century Sur. Co. v. Andrew*,

24  134 Nev. 819, 821, 432 P.3d 180, 183 (2018)) (internal citation omitted).

25      95.    "The insured pays a premium for the expectation that the insurer will abide by its

26  duty to defend when such a duty arises." *Century Sur.*, 134 Nev. at 822, 432 P.3d at 184. "In

27  

28  [29] Ex. 1.
[30] Ex. 1 at p. 19.

Nevada, that duty arises "if facts [in a lawsuit] are alleged which if proved would give rise to the duty to indemnify," which then the "insurer *must* defend." *Id*. (quoting *Rockwood Ins. Co. v. Federated Capital Corp.*, 694 F. Supp. 772, 776 (D. Nev. 1988) (emphasis added in original). Facts outside of the complaint cannot justify an insurer's refusal to defend its insured." *Id.,* 134 Nev. at n.4, 432 P.3d at n. 4.

96.    *Century Surety* explains that when an insurer believes facts outside the complaint justify rejecting its duty to defend, the insurer has two options. The insurer can agree to defend under a reservation of rights or file an action for declaratory relief. *Id.* (citing *Woo v. Fireman's Fund Ins. Co*., 161 Wash.2d 43, 164 P.3d 454, 460 (2007); Restatement of Liability Insurance § 13 cmt. c.). Indeed, Nevada law "forcefully encourage[s] insurers to offer to defend doubtful claims" based on the broad duty to defend. *Nautilus*, 482 P.3d at 690, citing *Century Sur*., 134 Nev. at 822 n.4, 432 P.3d at 184 n.4.

97.    The Policy provides that subject to the exclusions from coverage as stated therein, the Exceptions from coverage stated in Schedule B to the Policy, and the Conditions set forth therein, that North American insures Deutsche Bank for loss or damage sustained by reason of, any defect in or lien or encumbrance on the title, the priority of any lien or encumbrance over the lien of the insured mortgage, or the invalidity or unenforceability of the lien of the insured mortgage upon the title.[31]

98.    The Policy contains a CLTA 100 which provides additional insurance for any loss or damage sustained by Deutsche Bank as a result of "the existence of. . .[c]ovenants, conditions or restrictions under which the lien of the mortgage…can be cut off, subordinated or otherwise impaired."[32]

99.    The CLTA 100 also provides insurance for "[a]ny future violations on the land of any covenants, conditions or restrictions occurring prior to acquisition of title to the estate or interest referred to in Schedule A, or result in impairment or loss of the title to the estate or interest referred to in Schedule A…"[33]

---

[31] *Id*. at 19.
[32] *Id*. at 7.
[33] *Id*.

100. The Policy also contains a CLTA 115.2 endorsement which states North American insure "against loss or damage sustained by reason of: "against loss or damage sustained by reason of: [t]he priority of any lien for charges or assessments at Date of Policy in favor of any association of homeowners which are provided for in any document referred to in Schedule B over the lien of any insured mortgage identified in Schedule A." [34]

101. The CC&Rs is a document referred to in Schedule B.[35]

102. Schedule A refers to the Deed of Trust.[36]

103. Deutsche Bank has suffered damage or loss from Borrower's violation of the CC&Rs after issuance of the Policy and from Borrower's failure to pay assessments as they became due that resulted "in impairment or loss of the lien of the mortgage," of the Deed of Trust.

104. Deutsche Bank has suffered damage or loss due to the priority of the HOA's lien for assessments at the Date of Policy as provided for in NRS Chapter 116 and the CC&Rs.

105. As of the Date of Policy, North American was aware of the CC&Rs, the HOA's lien for unpaid assessments, and the fact that the lien could take priority over the Deed of Trust pursuant to NRS Chapter 116.

106. Schedule B, Paragraph 15 includes an exception for the HOA's CC&Rs states that "said covenants, conditions and restrictions provide that a violation thereof shall not defeat the lien of any mortgage or deed of trust made in good faith and for value."[37]

107. North American's misrepresented the CC&Rs as they expressly provide the HOA with a superpriority lien that upon foreclosure would "defeat" the Deed of Trust.

### *The Underlying HOA Foreclosure Sale and Quiet Title Litigation*

108. Borrower ceased making assessment payments to the HOA in violation of the covenant under Article XVIII, Section 18.12 of the CC&Rs.

---

[34] *Id*. at 12.
[35] *Id*. at pp. 15-16.
[36] *Id*. at 1.
[37] *Id.* at 3.

109.    On March 8, 2010, a Notice of Delinquent Assessment Lien ("Notice of Delinquency") was recorded against the Property by Leach Johnson Song & Gruchow ("HOA Trustee") as purported agent for the HOA.[38]

110.    The Notice of Delinquency states that "pursuant to the provisions of Nevada Revised Statutes," the HOA "claims a lien upon" the Property.[39]

111.    On April 15, 2010, HOA Trustee recorded a Notice of Default and Election to Sell Real Property to Satisfy Notice of Delinquent Assessment Lien ("NOD") against the Property.[40]

112.    The NOD states that it was being given pursuant to the Notice of Delinquency, which references the Nevada Revised Statutes and the HOA's CC&Rs.[41]

113.    On October 2, 2012, the HOA's subsequent trustee, Pro Forma Lien & Foreclosure Services, recorded a Notice of Foreclosure Sale Under Notice of Delinquent Assessment Lien ("NOS") against the Property.[42]

114.    The NOS references the Notice of Delinquency, which cites both the Nevada Revised Statutes and the HOA's CC&Rs.[43]

115.    Pursuant to the Foreclosure Deed, a non-judicial foreclosure sale occurred on December 12, 2013 (the "HOA Sale"), whereby 5916 Post Mountain Trust ("HOA Buyer") purchased the Property from the HOA for $12,200.00.[44]

116.    The Foreclosure Deed was recorded on December 19, 2013, by which HOA Buyer claimed an interest in the Property that it alleged was superior to Deutsche Banks's Deed of Trust.[45]

---

[38] A true and correct copy of the Notice of Delinquency recorded as Document Number 201003080001386 on March 8, 2010 is attached hereto as **Exhibit 14**.

[39] *Id.*

[40] A true and correct copy of the NOD recorded as Document Number 201004150002519 on April 15, 2010 is attached hereto as **Exhibit 15**.

[41] *Id.*

[42] A true and correct copy of the NOS recorded as Document Number 201210020003283 on October 2, 2012 is attached hereto as **Exhibit 16**.

[43] *Id.*

[44] A true and correct copy of the Foreclosure Deed recorded on December 19, 2013 as Document Number 201312190001105 is attached hereto as **Exhibit 17**.

[45] *Id.*

117.    The Foreclosure Deed confirms that the Property was sold in compliance with NRS 116 and the Notice of Delinquency.[46]

118.    Deutsche Bank filed a First Amended Complaint for quiet title against HOA Buyer in the U.S. District Court, District of Nevada, Case 2:15-cv-02420-APG-EJY (the "Litigation") seeking a declaration from the Court that Deutsche Bank's Deed of Trust survived the HOA Sale.[47] HOA Buyer filed its Amended Answer and Counterclaim, asserting that its interest in the Property was superior to Deutsche Bank's Deed of Trust.[48]

119.    After North American denied Deutsche Bank's title claim, refusing to defend Deutsche Bank in the Litigation in spite of acknowledging the claim to be potentially covered under the Policy, and failing to conduct an adequate investigation into Deutsche Bank's claim, HOA Buyer and Deutsche Bank subsequently reached a settlement wherein Deutsche Bank reconveyed its Deed of Trust.

120.    Deutsche Bank has incurred significant attorneys' fees and costs defending its interest in the Property.

121.    As of the Date of Policy, there existed "[c]ovenants, conditions, or restrictions under which the [Deed of Trust] c[ould] be cut off, subordinated, or otherwise impaired,"[49] including the payment covenant contained in the HOA's CC&Rs.

122.    The HOA Sale, conducted "pursuant to the authority and powers vested" by NRS Chapter 116 and the HOA's CC&Rs, resulted in the purported extinguishment of the Deed of Trust.

123.    Deutsche Bank has suffered losses or damages as a result of "future" (i.e., post-Date of Policy) "violation[s] on the land of" the HOA's CC&Rs – including Borrower's violation

---

[46] *Id.*

[47] A true and correct copy of Deutsche Bank's First Amended Complaint is attached hereto as **Exhibit 18**.

[48] A true and correct copy of 5916 Post Mountain's Amended Answer is attached hereto as **Exhibit 19**.

[49] *See* Ex. 2 (Chicago Title's 2013 Endorsement Manual) at 10, Paragraph 1(a).

of the covenant to pay assessments– which occurred prior to Deutsche Bank's acquisition of title to the Property and resulted in the "impairment or loss of the lien" of the Deed of Trust.[50]

124.    Additionally, Deutsche Bank has suffered loss or damage sustained by reason of the HOA's priority lien provided for in the HOA's CC&Rs over the Deed of Trust.

### Tender of the Claim and North American's Wrongful Denial

125.    On January 8, 2018, Deutsche Bank, by its counsel, provided written notice to North American (the "Claim") that a third-party purchaser was claiming an interest in the Property superior to its Deed of Trust.[51]

126.    The claim requested both indemnity and defense from North American pursuant to the Policy terms and highlighted the issuance of the Nevada Supreme Court's decision in *SFR Investments*, which held, for the first time, that an HOA lien could possibly extinguish a lender's Deed of Trust, and its possible detrimental impact on the First Deed of Trust.[52]

127.    The Claim also contained a copy of the Complaint in the Underlying Litigation, as well as a copy of the Court's Order denying the HOA Buyer's Motion to Dismiss. The Claim confirmed that the HOA Buyer "claims that the HOA lien is superior to the Deed of Trust and foreclosure on it extinguishes that Deed of Trust."

128.    On March 29, 2018, North American issued its claim determination and denied tender of the Claim.[53]

129.    In its claim determination, North American highlighted Section 18.3(b) of the CC&Rs which "address the priority of the association's lien as being subject to NRS 116.3116(2)."

130.    North American also highlighted that NRS 116 was enacted in 1991 and that "by operation of the statute, the Sierra Ranch's CC&Rs might entitle the association to a superpriority lien at some future date which would take priority over a subsequently recorded first deed of

---

[50] *See* Ex. 2 (Chicago Title's 2013 Endorsement Manual) at 10 (ALTA 9), at Paragraph 2(a).
[51] A true and correct copy of Deutsche Bank's correspondence to North American is attached hereto as **Exhibit 20.**
[52] *Id.*
[53] A true and correct copy of North American's First Claim Denial is attached hereto as **Exhibit 21**.

1  trust."

2      131.    As such, North American expressly found "the potential for a claim that the

3  CC&Rs in this instance might impair the deed of trust, triggering the application of the CLTA

4  100 Endorsement subject to all the policy's terms and provisions."[54]

5      132.    Additionally, North American found that the HOA claimed a lien pursuant to NRS

6  116.3116(2) and that under the Nevada Supreme Court's decision in *SFR Investments*, foreclosue

7  of such a lien extinguishes a first deed of trust even if it was recorded prior to the notice of

8  delinquency.

9      133.    As such, North American also found that "an actual loss to Deutsch (*sic*) Bank

10  resulting from the delinquent 'super priority' assessment lien would fall within the insuring

11  provision 6" of the Policy.

12      134.    Nevertheless, North American denied the Claim under Policy Exclusion 3(a),

13  which excluded "defects, liens encumbrances and adverse matters. . .created, suffered, assumed

14  or agreed to" by the insured.

15      135.    North American's denial under Exclusion 3(a) was premised on Deutsche Bank

16  (or its servicer/agent) receipt of a Notice of Default. North American made this finding based on

17  a "received" stamp on the April 15, 2010 copy of the Notice of Default, but it made no findings

18  as to which entity received this notice, nor whether receipt of the notice resulted in actual

19  knowledge of an adverse claim to title.

20      136.    Indeed, the Policy requires "actual knowledge" not constructive notice.

21      137.    North American found that "other institutional lenders had documented practice. .

22  . of tendering super priority lien amounts to preserve their interests in similar cases."

23      138.    However, North American conducted no investigation into Deutsche Bank's belief

24  of the threat posed by the HOA's collection activities.

25      139.    North American ultimately found that had Deutsche Bank "assumed the risk . . .

26  by failing to address the default."

27      140.    Additionally, found that even if Exclusion 3(a) did not apply, Condition 3 required

28  ────────────────
[54] *Id*. at 3.

1    Deutsche Bank to provide timely notice of the claim.

2        141.    Condition 3 of the Policy states that "the insured shall notify the Company in

3    writing . . . in case knowledge shall come to an insured hereunder of any claim of title or interest

4    which is adverse to the title to the estate or interest or the lien of the insured mortgage, as insured"

5    and if prompt notice is not provided, the Company's liability is limited to the extent of its

6    prejudice.

7        142.    "Knowledge" is defined under the Policy as "actual knowledge, not constructive

8    knowledge or notice which may be imputed to an insured by reason of the public records."

9        143.    Cases construing the term "actual knowledge" within the context of insurance

10   policies generally means that "insureds must actually know that a particular matter has an adverse

11   affect on the insured title." *Pennymac Holdings, LLC v. Fidelity Nat'l Ins. Co.*, 2018 Nev. LEXIS

12   721 (July 30, 2018) (unpublished disposition) (quoting *Title Insurance Law* § 8:5 (Sept. 2017).

13   Adequate notice of an adverse claim is an issue of fact. *Pennymac*, at *6 (citing *Green Tree*

14   *Servicing, LLC v. Chicago Title Ins. Co.*, 499 S.W.3d 771, 776-77 (Mo. Ct. Ap. 2016).

15       144.    North American failed to identify Deutsche Bank's "actual knowledge" under its

16   Condition 3 analysis.

17       145.    If North American's finding of actual knowledge was premised on Deutsche

18   Bank's alleged receipt of the Notice of Default, its investigation was unreasonable and insufficient

19   into Deutsche Bank's actual notice.

20       146.    Deutsche Bank did not have actual knowledge that the HOA's Lien was an adverse

21   claim to title.

22       147.    Deutsche Bank complied with all material conditions of the Policy, including

23   Condition 3.

24       148.    Condition 3 further states that where prompt notice is not given, the insurer's

25   liability will be reduced to the extent of any prejudice suffered.

26       149.    North American asserted that if it had been provided earlier notice of the HOA's

27   lien "there is no question that North American would have cured the foreclosing lien or taken

28   other necessary and appropriate action to reduce or avoid actual loss under the policy, thereby

allowing the insured to prevail against [the HOA's] lien and avoiding any potential third party claim of ownership."

150.    On information and belief, North American did not have a pattern and practice of curing the super-priority portion of an HOA's lien prior to HOA sales.

151.    On information and belief, North American would not have cured any portion of the HOA's Lien prior to the HOA Sale.

152.    North American was not prejudiced by any delay in notice.

153.    The issue of prejudice is also an issue of fact that goes beyond the pleadings in the underlying matter. *Las Vegas Metro. Police Dep't. v. Coregis Ins. Co*., 127 Nev. 548 553, 256 P.3d 958, 961 (2011); *see also Pennymac*, *supra*.

154.    Despite finding at least the potential for coverage under the Policy, North American denied Deutsche Bank's pleas for defense in the Underlying Litigation.

155.    North American denied coverage based on Exclusion 3(a) and Condition 3 only.

156.    It failed to analyze CLTA 115.2 in its denial.

157.    After receiving North American's denial, Deutsche Bank sent correspondence to North American, rebutting each of the stated grounds for North American's denial of coverage and requesting that North American reconsider its wrongful and bad faith denial of the Claim.[55]

158.    On June 12, 2018, North American responded to the Request for Reconsideration and again denied the Claim.[56]

159.    Because North American failed to properly assert any legitimate defense to coverage under the Policy, North American is estopped from asserting that coverage is not afforded for Deutsche Bank's claim. *See, e.g.,* NRS 686A.310(1)(n) (insurer must specify the "basis in the insurance policy" for denying the claim); NAC 686A.675 ("No insurer may deny a claim on the grounds of a specific policy provision, condition or exclusion unless reference to that provision, condition or exclusion is included in the denial."); *see also McKeeman v. Gen.*

---

[55] A true and correct copy of Deutsche Bank's Request for Reconsideration is attached hereto as **Exhibit 22**.

[56] A true and correct copy of North American's Second Claim Denial is attached hereto as **Exhibit 23**.

1    *Am. Life Ins. Co*., 111 Nev. 1042, 1050, 899 P.2d 1124, 1129 (Nev. 1995) ("An insurer may by

2    its conduct or dealings apart from the policy itself be estopped from denying that coverage has

3    been furnished for a risk which the insured has been led to believe is covered."); *Nautilus Ins. Co.*

4    *v. Access Med*., LLC, 482 P.3d 683, 690 (Nev. 2021) (recognizing the requirement to reserve

5    rights "where one party is claiming as of right something which the other believes to be

6    unwarranted"); *Teriano v. Nev. State Bank (In re Harrison Living Tr.),*121 Nev. 217, 222, 112

7    P.3d 1058, 1061 (Nev. 2005) (citing *Topaz Mutual Co. v. Marsh*, 108 Nev. 845, 853, 839 P.2d

8    606, 611 (1992) ("silence can raise an estoppel quite as effectively as can words.")).

9        160.    On information and belief, North American developed specific coverage positions

10   and claims handling guidance for claims related to Nevada association foreclosure sales.

11       161.    North American implemented and engaged in patterns and practices which call for

12   the denial of claims stemming from Nevada HOA foreclosure sales despite North American's

13   actual knowledge that the claims fell under the insuring provisions and policy endorsements.

14   These patterns and practices demonstrate that North American did not simply make a reasonable

15   mistake, but engaged in a systemic and reckless and/or intentional practice of mishandling and

16   denying otherwise valid claims in order to avoid its obligations under the Policy.

17                          **FIRST CAUSE OF ACTION**

18                            **(Declaratory Judgment)**

19       162.    Deutsche Bank incorporates and re-alleges all previous paragraphs as if fully set

20   forth herein.

21       163.    This Court has the power and authority to declare Deutsche Bank's and North

22   American's rights and legal relations in connection with the Policy.

23       164.    An actual controversy has arisen between Deutsche Bank and North American as

24   to whether the Policy provides coverage to Deutsche Bank for losses caused by the HOA's

25   foreclosure of its purportedly senior lien.

26       165.    On information and belief, CLTA 100 was issued with the Policy and insures

27   Deutsche Bank as a result of the existence of "[c]ovenants, conditions or restrictions under which

28   the lien of the mortgage…can be cut off, subordinated or otherwise impaired." CLTA 100 also

provides insurance for "[a]ny future violations on the land of any covenants, conditions or restrictions occurring prior to acquisition of title to the estate or interest referred to in Schedule A, or result in impairment or loss of the title to the estate or interest referred to in Schedule A…"

166.    The foreclosure of the super-priority portion of the HOA's lien imposed by the CC&Rs would "extinguish" or "subordinate" or "impair" the Deed of Trust.

167.    Thus, as of the Date of Policy, there existed "covenants, conditions, or restrictions under which the [Deed of Trust] [could] be extinguished, subordinated, or impaired."

168.    After the Date of Policy, Borrower violated the covenant to pay the HOA assessments. The CC&Rs states that a unit owner's covenant to pay assessments is an obligation that runs on the Property.

169.    The Borrower's post-Policy violation of their payment covenant thus constituted "[a] violation of a Covenant that (i) divests, subordinates, or extinguishes the lien of the Insured Mortgage [or] (ii) results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage…"[57]

170.    The foreclosure of the HOA's lien "extinguish[ed]" or "result[ed] in …unenforceability…" of the Deed of Trust.

171.    For these reasons, coverage is afforded under Paragraphs 1(a) and 2(a) of CLTA 100 for all losses and damages sustained by Deutsche Bank as a result of the HOA Sale.

172.    Additionally, upon information and belief the CLTA 115.2 was issued with the Policy and insures Deutsche Bank for loss or damage sustained by reason of "against loss or damage sustained by reason of: [t]he priority of any lien for charges or assessments at Date of Policy in favor of any association of homeowners which are provided for in any document referred to in Schedule B over the lien of any insured mortgage identified in Schedule A."

173.    Under NRS Chapter 116 and the HOA CC&Rs 's, the HOA had a priority lien at Date of Policy.

174.    The HOA's subsequent sale pursuant to the CC&Rs and NRS 116 resulted in damages to Deutsche Bank.

---

[57] *See* Ex. 2 (Chicago Title's 2013 Endorsement Manual) at 10, Paragraph 3(a).

175. As such, Paragraph 2 of CLTA 115.2 provides coverage.

176. Additionally, the insured complied with all material obligations under the Policy.

177. Alternatively, the insured was excused from compliance with any conditions precedent to coverage.

178. When the Policy was issued, it was the intent of Deutsche Bank's predecessor-in-interest and North American National that CLTA 100 and/or CLTA 115.2 would provide coverage for losses or damages sustained as a result of the CC&Rs and Borrower's violation of covenants to pay assessments to the HOA.

179. Contemporary trade usage describing the terms and scope of CLTA 100/ALTA 9 and CLTA 115.2/ALTA 5 indicates these endorsements provide coverage for an insured lender for losses and damages sustained as a result of covenants, conditions, and restrictions.

180. Policy exclusions and exceptions cannot be interpreted to remove coverage provided by CLTA 100 and CLTA 115.2. *See Nat'l Union Fire Ins. Co. of the State of Pa., Inc. v. Reno's Exec. Air, Inc.*, 100 Nev. 360, 365 (1984) ("Clauses providing coverage are broadly interpreted so as to afford the greatest possible coverage to the insured, [and] clauses excluding coverage are interpreted narrowly against the insurer.").

181. Deutsche Bank is entitled to a declaration that the Policy provided coverage for all losses or damages, up to the Amount of Insurance, sustained by Deutsche Bank as a result of the HOA Sale.

182. Deutsche Bank was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

### SECOND CAUSE OF ACTION

#### (Breach of Contract)

183. Deutsche Bank incorporates and re-alleges all previous paragraphs as if fully set forth herein.

184. Deutsche Bank is the insured under the Policy by reason of an assignment of all rights and interest under the Deed of Trust and indebtedness under the promissory note secured by the Deed of Trust.

185.    Deutsche Bank complied with all material conditions under the Policy, including Condition 3.

186.    The Policy gave rise to a duty to defend Deutsche Bank in the litigation and to either cure the defects on title or indemnify Deutsche Bank for any losses it sustained as a result of the loss of priority or extinguishment of its Deed of Trust.

187.    Additionally, because North American entered into a contractual relationship with Deutsche Bank's predecessor-in-interest in order to insure the Deed of Trust in senior position over the HOA's Lien, to the extent coverage is *not afforded* under the Policy, North American breached its contract with Deutsche Bank's predecessor.

188.    As described above, Deutsche Bank has suffered an insured loss and damages under the Policy.

189.    These breaches of the Policy have proximately resulted in general and special damages to Deutsch Bank, including attorneys' fees and litigation expenses, which Deutsche Bank has incurred and will continue to incur.  Such damages and expenses should be paid by North American under the Policy's terms.

190.    As a result of these breaches of the Policy by North American, Deutsche Bank was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

### **THIRD CAUSE OF ACTION**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

191.    Deutsche Bank incorporates and re-alleges all previous paragraphs as if fully set forth herein.

192.    North American owed Deutsche Bank a duty to act in good faith and in a manner consistent with fair dealing in its considerations of Deutsche Bank's claim under the Policy, including a duty of candor and to avoid denials of claims without reasonable basis.

193.    North American knew that industry materials and expert commentators routinely described the "comprehensive" CLTA 100 and CLTA 115.2 endorsements as providing coverage for an insured that suffered a loss as a result of the enforcement of a super-priority lien provided

for in an association's covenants, conditions, and restrictions at the time the Policy was issued.

194.    North American knew that their own underwriting manuals, bulletins, and endorsement guides indicated that CLTA 100/ALTA 9 and CLTA 115.2/ALTA 5 provided coverage to an insured that suffered a loss as a result of the enforcement of a super-priority lien provided in an association's covenants, conditions, and restrictions at the time the Policy was issued.

195.    In light of the foregoing, and on information and belief, North American issued the Policy with the belief that it would provide coverage if the Deed of Trust was impaired or extinguished by the enforcement of the HOA's lien.

196.    On information and belief, North American knew or had reason to know that Deutsche Bank's predecessor-in-interest purchased the Policy with the expectation that such coverage would be provided.

197.    On information and belief, North American knew or had reason to know that Deutsche Bank's predecessor-in-interest's expectation was reasonable in light of the trade usage and industry standards regarding CLTA 100/ALTA 9 and CLTA 115.2/ALTA 5 endorsements.

198.    On information and belief, North American knew or had reason to know that the CC&Rs expressly incorporated NRS Chapter 116 with regard to the HOA's enforcement of its assessment liens, yet misrepresented to Deutsche Bank under Schedule B that the CC&Rs did protect the Deed of Trust from extinguishment by enforcement of the HOA's lien.

199.    North American acted with malice, fraud, and/or oppression by allowing Deutsche Bank's predecessor-in-interest to obtain a title insurance policy that included endorsements known and described as providing coverage against the enforcement of an association's super-priority lien, then denying coverage for losses arising from the HOA's enforcement of its super-priority lien despite internal documents, guidelines, and bulletins indicating that coverage was due.

200.    North American has implemented and engaged in patterns and practices which call for the denial of claims stemming from Nevada HOA foreclosure sales despite its actual knowledge that the claims fell under the insuring provisions and policy endorsements, including

Deutsche Bank's Claim. These patterns and practices demonstrate that North American did not simply make a reasonable mistake, but engaged in a systemic and reckless and/or intentional practice of mishandling and denying otherwise valid claims in order to avoid their obligations.

201.    North American knew that Deutsche Bank did not have actual knowledge of an adverse claim to title which required notice of the claim.

202.    North American knew that they were not prejudiced as a result of any delay in notice because its own patterns and practices were to not tender the super-priority lien prior to an HOA sale.

203.    Deutsche Bank has suffered damages as a result of North American's bad faith and breach of its duty of good faith and fair dealing.

204.    Wherefore, Deutsche Bank prays for judgment against North American as set forth below.

## FOURTH CAUSE OF ACTION

**(Deceptive Trade Practices under Nev. Rev. Stat. 41.600 and 598.0915)**

205.    Deutsche Bank incorporates and re-alleges all previous paragraphs as if fully set forth herein.

206.    North American received valuable consideration in exchange for providing the Policy to Deutsche Bank's predecessor-in-interest.

207.    North American exchanged memoranda, bulletins, underwriting guides, and other communications indicating that CLTA 100/ALTA 9 and CLTA 115.2/ALTA 5 would provide coverage if an insured mortgage lien was impaired or otherwise affected by the enforcement of an HOA's super-priority lien.

208.    North American knew that public descriptions of CLTA 100/ALTA 9 and CLTA 115.2/ALTA 5 indicated that coverage would be available if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's super-priority lien.

209.    North American knew the Property was subject to the HOA's CC&Rs.

210.    Lender relied to its detriment upon North American's representations that CLTA 100/ALTA 9 and CLTA 115.2/ALTA 5 endorsements would provide such coverage by

originating the mortgage loan in reliance on those representations.

211.    Lender relied to its detriment upon North American's representation in the Schedule B exceptions that there was no provision in the CC&Rs allowed the HOA to take priority over the Deed of Trust, when in fact, the CC&Rs expressly incorporated the statute providing that the HOA's lien was superior to the Deed of Trust.

212.    By representing that CLTA 100/ALTA 9 and CLTA 115.2/ALTA 5 provided such coverage at origination, then failing to accept coverage under these endorsements North American engaged in consumer fraud as that term is defined in NRS 598.0915(5), (15) and NRS 41.600(2)(e) by misrepresenting the quality and characteristics of the Policy furnished to Deutsche Bank's predecessor-in-interest and making false representations in the transaction.

213.    Deutsche Bank has suffered damages as a result of North American's consumer fraud.

214.    As a result of North American's deceptive trade practices, Deutsche Bank was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

215.    Wherefore, Deutsche Bank prays for judgment against North American as set forth below.

### FIFTH CAUSE OF ACTION

### (Unfair Claims Practices under Nev. Rev. Stat.  686A.310)

216.    Deutsche Bank incorporates and re-alleges all previous paragraphs as if fully set forth herein.

217.    North American breached NRS 686A.310(1)(a-b) by the misrepresentations it made in the course of its claim denial and review, and that no provision in CC&Rs allow the HOA lien to take priority over the Deed of Trust under Schedule B despite the fact that the CC&Rs expressly provide the HOA with a superpriority lien.

218.    North American breached NRS 686A.310 by claiming that the HOA Lien arose because of the CC&Rs and later misrepresenting that the coverage decision found that the HOA Lien arose under NRS Chapter 116.

219.    North American was required to adopt and implement reasonable claims handling procedures to provide coverage. North American failed to do so, and instead implemented claims handling procedures that called for the denial by any means of claims by insured lenders whose deeds of trust were impaired by Nevada association's liens, in violation of NRS 686A.310(1)(c).

220.    By affirming the potential for coverage under the Policy for Deutsche Bank's claim and then failing to effectuate coverage within a reasonable time after proof of loss, North American violated NRS 686A.310(1)(d).

221.    North American's liability under the Policy for the extinguishment of the Deed of Trust was "reasonably clear," as shown by North American's internal memoranda, bulletins, underwriting guides, and other communications. By failing "to effectuate [a] prompt, fair, and equitable settlement[]" of Deutsche Bank's Claim, North American violated NRS 686A.310(1)(e).

222.    By compelling Deutsche Bank "to institute litigation to recover amounts due under" the Policy, Fidelity and Fidelity National violated NRS 686A.310(1)(f).

223.    North American also failed to provide Deutsche Bank with a reasonable explanation of the basis in the insurance policy, with respect to the facts of the claim and applicable law, for the denial of the claim, in violation of NRS 686A.310(n).

224.    In view of the acts and omissions alleged herein, North American's violation of NRS 686A.310 has been willful, malicious, oppressive, and tortious.

225.    As a result of North American's unfair claims practices, Deutsche Bank was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

226.    Wherefore, Deutsche Bank prays for judgment against North American as set forth below.

/ / /

/ / /

/ / /

/ / /

1

## **PRAYER FOR RELIEF**

2       Wherefore Deutsche Bank requests that this Court grant judgment in its favor and against

3   North American, and award Deutsche Bank:

4       A.      a declaration establishing (1) that the Policy provided coverage for all losses or

5   damages, up to the Amount of Insurance, sustained by Deutsche Bank as a result of the HOA's

6   foreclosure sale;

7       B.      compensatory damages;

8       C.      punitive damages;

9       D.      attorneys' fees;

10      E.      costs; and

11      F.      any other relief deemed to be just.

12      DATED this 28th day of March, 2022.

13                          WRIGHT, FINLAY & ZAK, LLP

14                          _/s/ Lindsay D. Dragon, Esq._

15                          Lindsay D. Dragon, Esq.
                            Nevada Bar No. 13474
16                          7785 W. Sahara Ave., Suite 200
                            Las Vegas, NV 89117
17                          *Attorneys for Plaintiff, Plaintiff, Deutsche Bank*
18                          *National Trust Company as Trustee for Morgan*
                            *Stanley ABS Capital I Inc. Trust 2006-NC5,*
19                          *Mortgage Pass-Through Certificates, Series 2006-*
                            *NC5.*
20

21

22

23

24

25

26

27

28